Aguida E. JOHNSON, Plaintiff,
v.
METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

Civ. A. No. 1266-65.

United States District Court
D. New Jersey.

Aug. 31, 1967.

McCarter & English, by Eugene M. Haring, and Alfred L. Ferguson, Newark, N. J., for defendant.

Stein, Bliablias & Goldman, by Dino D. Bliablias, Newark, N. J., for plaintiff.

COOLAHAN, District Judge:

Defendant moves for summary judgment in this action to recover the $30,000.00 face value of a life insurance policy under which plaintiff was the beneficiary; the insured was Richard Johnson, who died within 2 years of its issuance from burns suffered in a fire he admittedly started at the Johnson home. Defendant denies coverage and offers the return of premiums paid. Its disclaimer is based on the following exclusionary provision:

"Suicide—If, within two years from the date of issue, the Insured dies as a result of suicide, *while sane or in-*

*sane,* the liability of the Company will be limited to an amount equal to the premiums paid, without interest." (Emphasis added).

Metropolitan concedes the decedent's alleged insanity at the time of his self-destruction, for purposes of this motion. At trial, it would put plaintiff to her proof.

Such provisions as the one at Bar have become the common response of the insurance industry to early cases holding that an exclusionary provision for suicide did not bar acts of self-destruction committed while the insured was insane. See Annotation, "Insurance, Suicide—Sane or Insane", 9 A.L.R.3d 1015, 1017; Am-Jur. Insurance (Rev.Ed. § 1144). Those decisions assumed there could be no bar of suicide unless the deceased was able to form a conscious intention to kill himself and to carry out that act, realizing its physical—and moral—consequences.

Stated briefly, plaintiff's theory is that her husband's insanity at the time in question was of such an extent and nature as to preclude a finding of suicide, as that term should be interpreted in the policy. Hence, she reasons, the attempted precautionary phrase, "while sane or insane", does not apply, since it merely modifies the *sine qua non* of the exclusion, namely, a suicide. To avoid making the "sane or insane" language a complete nullity, plaintiff is led to the following necessary position: Some insane persons may still be mentally capable of forming the requisite intent and having the necessary perception to commit a "suicide"; their death would be barred under this policy. Other persons, of whom Richard Johnson was one, suffer from insanity of such intensity or form that they are incapable of suicide and are not barred by such an exclusionary provision.

Having considered the motion papers and argument, as well as the materials offered on a prior motion to consolidate this action with another,[1] I cannot agree

1. In a separate action, Mrs. Johnson has sued a second insurance company under a fire insurance policy covering the Johnson home. She and her husband were

with plaintiff's contention; on the facts of this case, defendant is entitled to summary judgment that the insured committed suicide within the meaning of the policy.

On the basis of the pleadings, answers to interrogatories, and admissions on file, it is undisputed that on July 7, 1965, the decedent spread fuel oil around the premises at 22 Alden Road, Montclair, New Jersey, saturated his clothing with fuel oil, set the premises and himself on fire, and died from the severe burns suffered in that fire. Plaintiff has represented that the illness which resulted in these acts involved severe psychosexual disturbance which had manifested itself both in the unfortunate relationship between Mr. and Mrs. Johnson, and in a "bizarre" series of incidents involving the decedent and his daughter over the course of many years. The details and specific physical circumstances of Mr. Johnson's death also allegedly reflect his sexual aberration in a shocking manner.

■ The lawsuit was commenced in the Superior Court of New Jersey, Essex County, Law Division, and was removed here on the basis of diversity. Accordingly, we must examine the above facts primarily in the context of New Jersey insurance law. However, to the extent that such law is not dispositive, I have considered the many cases of other jurisdictions on the precise point before me. See, e. g., Ricciuti v. Voltrac Tubes, Inc., 277 F.2d 809 (2nd Cir. 1960); Buhonick v. American Fidelity & Casualty Co., 190 F.Supp. 399 (W.D.Pa., 1960); Peerless Insurance Co. v. Cerny & Associates, 199 F.Supp. 951 (D.Minn.1961). At the outset, it is clear that New Jersey has a strong public policy against suicide or any actions which might encourage it. Potts v. Barrett Division, 48 N.J.Super. 554, 138 A.2d 574 (App.Div., 1958) [and cases cited]. Inherently, life insurance policies provide an incentive at cross-purpose with this policy. Therefore, while ambiguities in adhesion insurance contracts are to be construed generally against the draftsman insurer, Ruvolo v. American Casualty Co., 39 N.J. 490, 189 A.2d 204 (1963), this issue suggests at least some counterbalancing ground for furthering New Jersey policy by a construction of the suicide exclusionary clause which will not undermine that policy by facilitating circumvention of the exclusion.

■ To the extent that an exclusionary clause is not deemed ambiguous, New Jersey Courts generally will give it effect to limit the insurer's risk if it is reasonable and not contrary to public policy. James v. Federal Insurance Co., 5 N.J. 21, 73 A.2d 720 (1950); Capece v. Allstate Insurance Co., 88 N.J.Super. 535, 212 A.2d 863 (Law Div., 1965). Nor should ambiguity be too readily implied for an exclusionary clause merely because the purpose of the insured was to seek liability to the beneficiary on the part of the insurer in case of the insured's death. The exclusionary provision is not a step-child, but a competent part of the contract and its purpose must also be considered. "Exclusionary clauses must be examined and interpreted in light of their design and intent as well as in view of the objects and purposes of the policy." State Farm Mutual Automobile Insurance Co. v. Cocuzza, 91 N.J.Super. 60, 65, 219 A.2d 190, 193 (Ch.Div. 1966).[2]

---

joint beneficiaries. Since that insurer also raised the decedent's self-destruction as a defense (under a provision excluding liability for fire risk materially increased by a beneficiary), the plaintiff sought to consolidate the actions. Despite the clear overlap of certain issues regarding the decedent's mental state in the two cases, I denied consolidation without prejudice, pending the outcome of this motion.

2. Linden Motor Freight Co., Inc. v. Travelers Ins. Co., 40 N.J. 511, 193 A.2d 217 (1963), is distinguishable. While the Court warned against an overly semantical approach where such literal interpretation would unfairly restrict the protection afforded under policies carefully drawn by insurers, its concern was with "technical encumbrances or * * * hidden pitfalls," which if read literally "would largely nullify the insurance."

The most pertinent New Jersey decision is Ruvolo v. American Casualty Co., supra, which did not involve the suicide of an insured, but rather the contested liability of Dr. Ruvolo's insurer for the death of his partner Dr. LaFace, who was apparently shot by Dr. Ruvolo while the latter was insane.

The widow plaintiff won a declaratory judgment that the exclusion for the insured's intentional acts did not apply if he was sufficiently insane. Reversing, the New Jersey Supreme Court disapproved of summary judgment granted on the basis of psychiatrist's affidavit, and remanded the matter for trial on that issue. By implication and in express dictum, it approved the lower court's holding that if Dr. Ruvolo was unable to know the nature and quality of his act, or to distinguish right from wrong, or to control his conduct, the homicide would not be within the policy exclusion.[3]

Patently, *Ruvolo* involves no self-destruction by the insured at all. Nonetheless, plaintiff asserts that the decision indicates New Jersey law would allow recovery here, because the Supreme Court's opinion in *Ruvolo* analogized its reasoning to earlier cases wherein recovery for self-destruction by an insane insured was permitted despite an exclusionary clause. This reliance is misplaced in that those decisions dealt specifically with "suicide" exclusions which did not contain the "sane or insane" proviso at Bar. E. g., Mutual Life Ins. Co. v. Terry, 15 Wall. 580, 21 L.Ed. 236 (1873). In fact, juxtaposition of the *Terry* case with Bigelow v. Berkshire Life Insurance Co., 93 U.S. 284, 23 L.Ed. 918 (1876) decided only three years after *Terry*, strongly militates against plaintiff's position. The policy in *Bigelow*, contained

a *suicide while sane or insane* form of exclusion and the Court explicitly distinguished *Terry* on that ground. These, and the other cases cited by the New Jersey Supreme Court in *Ruvolo*, suggest that the Court thought the intentional act exclusion in *Ruvolo* corresponded to the self-destruction exclusion, without any accompanying expansion of such exclusion to include insane insureds, faced in the *Terry* case. If so, then the addition of the sane or insane modifier would correspond to the next rung up the ladder of protection for the insurer, and one which the reasoning in *Ruvolo* leaves untouched. The rest of that opinion insofar as it is at all pertinent here merely reiterates the general maxims of construction referred to above, which I have taken into consideration.

The other New Jersey case offered by plaintiff, Kobylakiewicz v. Prudential Ins. Co., 115 N.J.L. 382, 180 A. 491 (Sup.Ct.1935), is also inapposite for the same reasons. There, insanity impelling the insured's self-destruction was held sufficient to qualify the death within an "external, violent and accidental means" provision.

■ The real heart of plaintiff's contention is focused more sharply by cases from other jurisdictions which have construed similar provisions. Plaintiff concedes that the majority rule is that a sane or insane addition to the suicide exclusion bars recovery for the insured's self-destruction regardless of the degree or nature of the mental disorder from which he was then suffering. A review of the numerous decisions to this effect ably marshalled by the defendant in its brief, would be supererogatory in light of the very recent annotation on this

40 N.J. at 524, 193 A.2d 217 at 224 (quoting from Kievit v. Loyal Protective Life Insurance Co., 34 N.J. 475, 482–483, 170 A.2d 22 (1961)). The ultimate guideline offered in *Linden Motor Freight* was "the reasonable expectation of the average purchaser in the light of the contract language." This is, of course, precisely the context in which the defendant now urges that the

clear meaning and purpose of the exclusion was to exclude from the scope of the insurer's risk any self-inflicted death, regardless of the decedent's mental status.

3. The *Ruvolo* policy exclusion in question made coverage inapplicable " * * * (c) to * * * death * * * caused intentionally by or at the direction of the insured."

precise point, "Insurance: Construction of 'Sane or Insane' Provision of Suicide Exclusion" 9 A.L.R.3d 1015 (1966). The several distinct facets of the effect to be given a "suicide, sane or insane" provision are well summarized in that annotation as follows:

"In construing the suicide exclusion as modified by the term 'sane or insane' (or equivalent language), the courts have reached substantial agreement that liability for a merely accidental death is not excluded, even though the destructive act was, in a sense, that of the insured as where he accidentally shot himself. On the other hand, the position has generally been taken that even though the term 'suicide' is used in the exclusion, the addition of the words 'sane or insane' does away with any necessity that the insured have had comprehension of the moral or legal nature and consequences of the destructive act. It also seems to be well settled that death from a self-destructive act falls within the exclusion of death from 'suicide, sane or insane,' although the act was the result of an irresistable impulse and therefore not intended or mentally consented to by the insured.

The courts have reached widely opposed results, however, in passing upon the question whether 'suicide, sane or insane', can be found where the insured, at the time he destroyed himself, was so insane as not to be able to appreciate or comprehend the physical nature and consequences of the destructive act. Several courts have held that the lack of such comprehension is immaterial and that recovery is barred if the act committed was of such a character that if performed by a sane person, it would be regarded as suicidal. Other courts have held that if the insanity was such that the insured did not comprehend that the act would be injurious or fatal, or did not intend the fatal consequence of the act because of his insanity, the act could not be characterized as 'suicide' for the purpose of the exclusion clause." 9 A.L.R.3d, at 1018. [Citations omitted].

To the same effect see Appleman, 1 Insurance Law and Practice, § 363 (1965).

Taking each of the above aspects, one at a time, it becomes apparent that the issue here is limited. Plaintiff does not contend that the self-destructive acts of the decedent were accidental, in the sense that he inadvertently poured the oil and set it afire. Nor has she sought to imply that the suicide provision requires appreciation of the moral or criminal aspects of the self-destruction, as many of the early decisions did. Her contentions, rather, are a combination of the last two categories summarized above: the notion that insanity producing an irresistible impulse to do the destructive act negates the necessary volitional intent for "suicide"; and second, the argument that if insanity precludes comprehension of the fatal consequences of the act, the ensuing death is not within a suicide provision, notwithstanding the attempt to include suicides "while sane or insane."

In the present case, however, even assuming, without deciding, that comprehension of the fatal character of his action was required, plaintiffs have offered no allegation, let alone specific factual contentions which could support a reasonable conclusion that the decedent was unaware of the fatal consequences of his acts; indeed, such a contention would beggar credibility in light of the stipulated circumstances of his death. In addition to the above mentioned facts, it is not disputed that the decedent left two notes at the fire, at least one of which clearly indicates an appreciation of the fatal course on which he was about to embark. This situation is similar to that in Clarke v. Equitable Life Assurance Society, 118 F. 374 at page 378 (4th Cir., 1902) where the Court said:

"The contention of the appellant is that self-destruction avoids the policy if the insured lacked intelligence to know that his act was wrong, but that it is not avoided if he did not understand the

594

physical nature of his act. To sustain such contention would require us to believe that the deceased shot himself through the head because he did not know that it would kill him."

■ Further, even if it were less clear in the instant case that the decedent knew death would follow his act, this Court would follow the sound majority rule that applicability of a "suicide, sane or insane" clause is not dependent on the insured's clear realization of the physical nature and consequences of his acts, for the reasons well stated in the most recent discussion of the rule in Aetna Life Ins. Co. v. McLaughlin, 380 S.W.2d 101, 9 A. L.R.3d 1005 (Tex.) (1964); see also Couch, 9 Insurance 2d, § 40.42 (1962).

■ Plaintiff's remaining position, then, is that her husband's insanity, assuming it be proved, may have been of such a nature that he was irresistibly compelled by impulse to immolate himself, and therefore, that his action was no more the product of a conscious intent that would be a purely accidental act, e. g., the inadvertent discharge of a gun, on the part of a sane insured.

In this regard, one must be careful to distinguish questions of intent and questions of motive. Psychoanalytically oriented and other schools of "depth psychology" have made the notions of "unconscious" or "subconscious" motive common parlance. But it is not helpful to define "suicide" as an intentional self-destruction, and then to confuse the slippery notion of "intent" with its underlying causes.

Whatever the constellation of drives, impulses or subconscious motives which cause the subject to perform a given act, unless that act is actually inadvertent, its physical execution is "intentional" in the ordinary sense of the word. In short, my motive for doing, or impulse to do, the act is one thing; the fact that I therefore intend to do it and do so is a separate point and one that is not here in doubt. To the extent that Richard Johnson clearly understood the fatal consequences of his actions, his self-destruction was intentional suicide.

Plaintiff would go even further and persuasively define suicide for all purposes as a completely voluntary action, uncompelled by either inner or external compulsion. This approach has been advanced before and rejected by many courts. E. g., Clarke v. Equitable Life Assurance Soc., supra; Columbian Nat. L. Ins. Co. v. Wood, 193 Ky. 395, 236 S.W. 562 (1922); Strassberg v. Equitable Life Assur. Soc., 196 Misc. 387, 91 N.Y.S.2d 903 (1949); and see other authorities at 9 A.L.R.3d 1015, 1040. The Columbian case rejected this "irresistible impulse" argument, even though Kentucky courts follow the minority rule (frequently cited as the "Kentucky rule") that a "suicide, sane or insane" clause does not apply if the insured lacked an intent to kill himself and did not realize his act would be fatal. The court distinguished the two positions and noted that if the irresistible impulse exception was also adopted, the stipulation against insane suicides would be reduced to a nullity since self-destruction committed when it was not intended, and self-destruction committed under an irresistible impulse cover the entire range of cases in which the decedent's insanity would differentiate him from a sane insured.

Plaintiff claims the mantle of modern enlightened psychiatric knowledge, yet relies on the psychological analysis of an 1875 dissent, De Gororza v. Knickerbocker Life Ins. Co., 65 N.Y. 232, 244 (1875), which predates even Freud's Victorian writings. If anything, modern psychology and psychiatry, particularly has counseled that the line between volition and irresistible impulse, conscious and unconscious motive is a murky and uneven one. If it has been necessary to open this Pandora's box in the sphere of criminal responsibility and to apply our imprecise tools as best we can, most courts have, I think wisely, kept it shut on the present issue by giving the "suicide, sane or insane clause" its plain, intended meaning. As the Supreme Court

595

sensibly pointed out almost a century ago, it is precisely to avoid such imponderables that the insurer inserts the modifying language. Bigelow v. Berkshire Life Ins. Co., supra, 93 U.S. at 286, 23 L.Ed. 918.

Since the defendant, for purposes of this motion, concedes that the insured was insane, and since the remaining factual determinations regarding the nature of that insanity, insofar as they are reasonably open to dispute, are legally irrelevant to the exclusionary clause relied on by the defendant, "there is no genuine issue as to any material fact" and the defendant is entitled to a judgment as a matter of law.

Let an appropriate order be submitted.